Judgment rendered March 9, 2022.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 54,265-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                    Appellee

versus

JORGE LOPEZ BENAVIDES                  Appellant

* * * * *

Appealed from the
Fourth Judicial District Court for the
Parish of Ouachita, Louisiana
Trial Court No. 15-F2405

Honorable Marcus L. Hunter, Judge

* * * * *

LOUISIANA APPELLATE PROJECT            Counsel for Appellant
By: Prentice Lang White

ROBERT STEPHEN TEW                     Counsel for Appellee
District Attorney

SHIRLEY M. WILSON-DAVIS
Assistant District Attorney

* * * * *

Before MOORE, ROBINSON, and O'CALLAGHAN (*Pro Tempore*), JJ.

**MOORE, C.J.**

A unanimous jury convicted Jorge Lopez Benavides as charged for two counts of vehicular homicide (La. R.S. 14:32.1) and one count of first degree vehicular negligent injuring (La. R.S. 14:39.2). The trial court imposed a sentence of 20 years and 19 years at hard labor for each count of vehicular homicide, to be served consecutively as required by statute. For the first degree vehicular negligent injury, the court imposed a 3-year sentence to be served concurrently with the homicide sentences.[1] The court also imposed $5,000 fines for each homicide conviction, or in default thereof, to serve 720 days each, and a $5,000 fine for vehicular negligent injuring, or in default thereof, 180 days. Additionally, for each of the three convictions, the court ordered Benavides to pay $5,000 to the Crime Victims Reparations fund, for a total of $30,000 in fines and reparations. The court ordered all default time to be served concurrently. Benavides received credit for time served since September 27, 2015.

Benavides appealed alleging that the evidence at trial was insufficient to sustain his conviction for first degree vehicular negligent injuring, and the consecutive 20-year and 19-year sentences constitute a 39-year sentence that is constitutionally excessive for this 47-year-old first offender.

For the following reasons, we affirm in part, amend in part, reverse and vacate in part, and remand with instructions.

---

[1] The trial court initially imposed sentences of 20 years and 19 years for each vehicular homicide conviction and ordered them to be served concurrently, plus a 3-year sentence for first degree negligent injuring, consecutive to the concurrent sentences. However, after reviewing the statute's penalty provision that requires *consecutive* sentences for each count where two or more deaths result from the incident, the court made the homicide sentences consecutive, and the negligent injuring sentence concurrent. La. R.S. 14:32.1(D).

**FACTS**

Jorge Lopez Benavides, a 47-year-old resident of Mississippi, spent the evening of September 26, 2015, visiting a friend in the Monroe area. Shortly after 11:00 p.m., while driving his white Toyota Tundra pickup truck on La. 594, Benavides entered the exit ramp at Exit 124 of I-20 East and began traveling west on the inside lane of the two eastbound lanes. Several vehicles swerved to avoid colliding head-on with Benavides, who apparently remained unaware that he was traveling in the wrong direction despite oncoming vehicles. One of the eastbound vehicles swerved across the outside lane and the shoulder before colliding with a fence. No injuries resulted from that accident.

Moments later, Benavides' truck collided head-on with a blue Ford Mustang driven by Thomas Williams, age 20. Williams and his front-seat passenger, Jamerro May, age 19, died at the scene within minutes of the collision. A back-seat passenger, Randarious Cooper, age 16, sustained injuries. He was apparently airlifted by helicopter to LSU-HSC in Shreveport, and ultimately spent 4 weeks in hospitals.

Benavides suffered only minor injuries as a result of the collision. He was taken to Glenwood Medical Center in West Monroe where he spent one night for observation before his arrest upon release the next day. State trooper Michael Williamson testified that he arrived at the hospital shortly after Benavides and was directed to his room where he was being examined for injuries. He said there was a strong odor of alcohol and Benavides appeared to be intoxicated. He was Mirandized and a blood sample was obtained by the state police. The test showed .15% blood alcohol, nearly double the legal limit of .08%.

2

Benavides was initially charged by bill of information with five offenses: two counts (Counts I and II) of vehicular homicide, one count (Count III) of first degree vehicular negligent injuring, and two misdemeanor charges (Counts IV and V), driving the wrong direction on a one-way, and driving without a valid driver's license. Subsequently, an amended bill was filed that did not include the two misdemeanor charges.[2]

Benavides moved to suppress the blood alcohol test results on grounds of a warrantless search, but these were ultimately found admissible.

Benavides remained in jail while awaiting trial for more than 5½ years after the accident and his arrest. Following a three-day trial, a jury found him guilty as charged on all three counts.

At trial, Dr. Frank Paretti, a forensic pathologist, testified that he performed the autopsies on the victims, Williams and May. He described the injuries suffered by each that resulted in their deaths minutes after the accident. Williams bled to death from a completely severed aorta; May died from massive trauma to his head and body.

Two witnesses, Morgan Anderson Graham and Lathaius Simmons, testified that they were driving east on I-20 moments before the collision and were forced off the interstate to avoid a head-on collision with the Toyota truck driven by Benavides. Ms. Graham's father, Brad Anderson, testified that his shaken daughter called him after she was forced off the interstate. When she returned home, he removed a video camera mounted above her rear-view mirror; this contained video footage of Benavides' truck traveling

_____

[2] In the original bill, Counts One and Two alleged that Benavides' blood alcohol level was .15% or more, contrary to La. R.S. 14:32.1; however, in the amended bill, these counts alleged that his blood alcohol level was .08% or more, also contrary to La. R.S. 14:32.1.

3

in the wrong direction. He turned the video over to the state police when he learned of the fatal accident, and it was played to the jury.

Randarious Cooper's mother, Wanda Lagino, testified that the police came to her door and told her that there had been an accident in which two people had passed away and her son was injured. She then went to the Delhi Police Department, where a state trooper told her she needed to hurry to Shreveport because her son might not survive. She testified that Randarious spent two weeks at LSU-HSC and two weeks at Willis-Knighton recovering from his injuries. The prosecutor asked Ms. Lagino if Randarious's injuries were serious and if he still dealt with them; she responded, "yes, ma'am."

Three of the state troopers who worked the accident scene testified at trial. Trooper Ian Dollins, the first trooper to arrive at the scene, observed the two young men in the front seat of the blue Mustang bleeding profusely. He said that although they appeared to be alive, they were unresponsive to his screams to unlock or open the door. He did not see and was not aware of anyone in the backseat of the vehicle. He did not learn until later that there was a third person in the backseat of the vehicle. Trooper Michael Williamson, who arrived at the scene to assist Tpr. Dollins, testified that he saw the two victims in the front seats, and they appeared to be deceased. He did not see Randarious Cooper in the backseat of the vehicle. Shortly afterwards, Tpr. Dollins went to Glenwood to make contact with Benavides.

Trooper James Olmstead was dispatched to the scene to assist Tpr. Dollins in the investigation at 11:15 p.m. He testified that the victims were deceased when he arrived, but still in the blue Mustang; he did not see a backseat passenger; Benavides had already been taken to Glenwood. Trooper Olmstead was not asked about the narrative in the police report he

4

wrote, to the effect that Randarious Cooper was "transported to LSU Hospital (Shreveport) in critical condition." Hence, it is not clear whether his knowledge of Cooper's condition was firsthand. This report, though part of the appellate record, does not appear to have been placed into the evidence at trial.

The exhibits that were put into evidence contain photographs of the deceased victims and of the severely damaged blue Mustang. There is also a DVD recording taken from Tpr. Dollins' dash camera. This recording captures almost 32 minutes after Dollins arrived at the accident, a helicopter descending on the other side of several emergency vehicles and landing either on the median or on the interstate itself. Some 28 minutes later, the helicopter is seen lifting off, presumably headed to Shreveport.

During closing argument, defense counsel argued that the state had failed to prove "serious bodily injury" to Randarious Cooper, a necessary element to prove the charge of first degree negligent injuring.

After deliberations, the jury found Benavides guilty on all three counts as charged.

At the sentencing hearing, the members of the deceased victims' and of Benavides' families were permitted to address the court. Benavides himself made a statement in which he accepted responsibility for the terrible accident, and he apologized to the victims' families. The court then imposed the sentences.

The court later denied Benavides' motion to reconsider sentences. This appeal followed.

**DISCUSSION**

By his first assignment of error, Benavides contends that the trial court erred by accepting the jury's verdict of first degree negligent injuring when the state failed to present any medical documentation to establish what injuries Randarious Cooper sustained as a result of the accident. Other than his mother's personal assessment that his injuries were serious, there was no medical testimony or medical records that described the injuries, specifically, whether they involved, e.g., unconsciousness, extreme pain, or posed a serious risk of death, as required by the statute. Hence, Benavides argues that the "serious bodily injury" element of the offense was not proven beyond a reasonable doubt.

The state argues that the jury could infer from the totality of circumstantial evidence that Cooper suffered serious bodily injuries: there was extensive damage to the Ford Mustang where the driver and front-seat passengers were killed and he was a backseat passenger; Trp. Dollins was unaware of anyone in the backseat when he tried to get the front-seat victims, who appeared to be still alive, to respond to his shouts to open the door (and this implies that Cooper was probably unconscious); Trp. Williamson did not see a passenger in the backseat when he went to the vehicle; and Cooper was airlifted by helicopter to Shreveport for emergency medical treatment. The state argues that a jury could infer that the injuries were serious, i.e, life-threatening. Finally, Cooper's mother testified that she was advised by a state trooper to go to the hospital in Shreveport because her son might not survive. She said Randarious was in the hospital for four weeks as a result of the injuries that still bothered him. Based on the totality

of these facts, the state maintains that the jury could reasonably conclude that Cooper suffered serious injuries.

The standard for reviewing a sufficiency of the evidence claim is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979); *State v. Tate*, 01-1658 (La. 5/20/03), 851 So.2d 921, *cert. denied*, 541 U.S. 905, 124 S. Ct. 1604, 158 L. Ed. 2d 248 (2004). This standard, now codified La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. *State v. Pigford*, 05-0477 (La. 2/22/06), 922 So. 2d 517. The reviewing court does not assess credibility or reweigh the evidence. *State v. Marcantel*, 00-1629 (La. 4/3/02), 815 So. 2d 50. In cases where proof is based on circumstantial evidence, the evidence "must exclude every reasonable hypothesis of innocence" in order to support a conviction. La. R.S. 15:438. All the evidence, both direct and circumstantial, must meet the *Jackson* reasonable doubt standard to support a conviction. *State v. Jacobs*, 504 So. 2d 817 (La. 1987); *State v. Copes*, 566 So. 2d 652 (La. App. 2 Cir.1990).

On the date of the accident, September 26, 2015, first degree vehicular negligent injuring was defined by La. R.S. 14:39.2 as "inflicting of *serious bodily injury* upon the person of a human being when caused proximately or caused directly by an offender engaged in the operation of, or in actual physical control of, any motor vehicle, aircraft, watercraft, or other means of conveyance" when the offender was "under the influence of alcohol" or had

7

"a blood alcohol level of .08 per cent or more."[3] (Emphasis supplied). The statute also defined "serious bodily injury":

> C. For purposes of this Section, "serious bodily injury" means bodily injury which involves unconsciousness, extreme physical pain or protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member or organ or a mental faculty, or a substantial risk of death.[4]

The "serious bodily injury" element in *first degree* vehicular negligent injuring, a felony offense punishable by up to five years imprisonment, is what distinguishes the offense from the lesser offense of vehicular negligent injuring, a misdemeanor punishable by up to six months' imprisonment. The lesser offense requires only a showing of "any injury." *State v. Christophe*, 12-82 (La. App. 5 Cir. 10/16/12), 102 So. 3d 935, *writ denied*, 12-2432 (La. 4/19/13), 111 So. 3d 1029. Hence, for a jury to find that the serious bodily injury element has been met, the evidence must show that the victim suffered any one of the following:

(1) unconsciousness, or
(2) extreme pain, or
(3) protracted and obvious disfigurement, or
(4) protracted loss or impairment of the function of a bodily member or organ or mental faculty, or
(5) substantial risk of death.[5]

In this case, the state adduced no medical or firsthand, direct testimony at trial that described Randarious's injuries as involving

---

[3] Operating a motor vehicle while under the influence of one or more controlled dangerous substances or drugs that are not controlled dangerous substances but dangerous when combined with alcohol or taken in excessive quantities are also listed in the statute.

[4] This paragraph was repealed by 2019 La. Acts No. 2, § 3; however, the same definition of serious bodily injury applies to all offenses that include an element of serious bodily injury, such as second degree battery. La. R.S. 14:2 (C).

[5] Clearly, the "substantial risk of death" must arise from the bodily injury suffered by the victim, not the risk posed by the accident or collision.

unconsciousness, extreme pain, a substantial risk of death, or other factors. There was no testimony regarding what injuries he suffered, e.g., broken bones, lacerations, head bumps, and no medical records or photographic exhibits of his injuries. Randarious did not testify and his mother testified only that the injuries were "serious," but she gave no details or description of the injuries that made her draw that conclusion. Insofar as proof of serious bodily injury, her testimony was conclusory. In the absence of such direct evidence, the jury had only circumstantial evidence from which to infer Randarious sustained "serious bodily injury" without having any idea what injuries he sustained.

As noted, where proof of a fact is based on circumstantial evidence, the evidence "must exclude every reasonable hypothesis of innocence" in order to support the conviction. R.S. 15:438. Benavides concedes that Randarious must have suffered some injury, but without knowing what the injuries involved through medical testimony or records, a jury could only have returned a guilty verdict for vehicular negligent injuring.

We first consider whether medical records or expert testimony are required to prove "serious bodily injury." Although such evidence would have settled the question, several cases applying the same statutory definition of "serious bodily injury" have held that it may indeed be proved without testimony from a medical expert or medical records. Courts have held that testimony from the victim or from a fact witness can be sufficient to show serious bodily injury and support a conviction for first degree vehicular negligent injuring. For example, in *State v. Bellow*, 08-259 (La. App. 5 Cir. 7/29/08), 993 So. 2d 307, *writ denied*, 2008-2109 (La. 4/13/09), 5 So. 3d 162, the court held that the evidence was sufficient when one of the

9

victims testified that as a result of the collision, he suffered a cracked sternum and was unable to work for two months, while his wife, the other victim, testified that she too suffered various bodily injuries due to the accident, and was hospitalized for 68 days. The court held that each victim's description of the injuries they suffered was sufficient evidence of serious bodily injury.

The "serious bodily injury" element in first degree vehicular negligent injuring is the same as that in second degree battery offenses. In *State v. Hall,* 03-1384 (La. App. 5 Cir. 3/30/04), 871 So. 2d 558, the court concluded that the testimony of a victim or a witness may present sufficient evidence to show that a victim sustained a serious bodily injury required to support a second degree battery conviction without any testimony of experts. Just as in the case *sub judice,* the defendant argued that the state offered no evidence of serious bodily injury by medical expert testimony or exhibits of medical records, so surely the jury could only infer the severity of the victim's injuries. However, the court rejected this argument, finding the victim testified regarding the beating and her injuries: she was sprayed with mace and beaten and kicked by the defendants. The mace caused her eyes to burn and was extremely painful, made breathing difficult, and made her feel like her esophagus was swollen; she required 15 stitches to close the various lacerations on her nose from being struck in the face with a bottle; her treating physician sent her to a plastic surgeon regarding scarring from this injury. The victim's testimony alone describing these injuries was sufficient to sustain the convictions for second degree battery.

The *Hall* case is distinguishable from this case, however, because there is no testimony describing the injuries that Randarious suffered from

10

the accident, as well as no medical records or testimony regarding the medical treatment he received.

In *State v. Helou*, 02-2302 (La. 10/23/03), 857 So. 2d 1024, the Supreme Court reversed an appellate court finding that the evidence was sufficient to prove the serious bodily injury element of second degree battery. The victim was beaten by three men, including the defendant. According to the victim's testimony and eyewitness testimony, he bled so much that his clothes were saturated in blood. A bystander, who was a former army medic, testified that there was so much blood on the ground it was difficult to tell where it came from. The state maintained that the large amount of blood loss from the victim was sufficient evidence to infer that the victim suffered serious bodily injury by virtue of suffering extreme physical pain. The Supreme Court disagreed, finding that the presence of blood alone does not satisfy the "serious bodily injury" element. It noted that the state failed to offer any evidence of "extreme physical pain" by way of testimony from the fact witnesses, or any testimony from medical witnesses or medical records, which could have proven this factor. The court concluded that loss of blood is not tantamount to "extreme physical pain" *Helou*, *supra* at pp. 6-8, 857 So. 2d at 1028-29.

Therefore, while testimony from a medical expert or even medical records would typically be dispositive of the issue of "serious bodily injury," it is not absolutely required. A victim can testify to his or her injuries and what they involved, such as unconsciousness, extreme pain, protracted loss or impairment of a bodily member, and so on, enabling the fact finder to determine if the injuries fall within the category of "serious bodily injury." Likewise, a fact witness can also testify to many of those things.

11

On the other hand, the use of circumstantial evidence to prove serious bodily injury can be problematic, as in *Helou*, *supra*, where even though the victim lost a great amount of blood due to the beating, it did not show that he suffered extreme pain, or substantial risk of death or disfigurement necessary to prove a serious bodily injury. In fact, the extreme loss of blood in *Hall* was due to a punch in the nose. While loss of a lot of blood could accompany a serious bodily injury, that alone does not establish that the injury involved extreme pain; a relatively minor injury could result in loss of a lot of blood.

In this case, there was no medical evidence whatsoever, and Randarious did not testify regarding his injuries or the medical treatment he received; no witnesses described his injuries, and his mother's testimony that the injuries were serious was conclusory and unsupported by any description of the injuries he sustained. Hence, the state's case for "serious bodily injury" is almost entirely circumstantial.

The state argues that the jury could infer serious bodily injury from the following circumstances:

(1) The jury could infer that Cooper was unconscious as a result of an injury from the collision, based on Trp. Dollins' testimony that he unsuccessfully screamed into the car to get the semiconscious or unconscious victims in the front to open the door. This assumes that Cooper was still in the backseat of the Mustang (unknown to Trp. Dollins) and he would have responded if he were conscious.

(2) The jury could infer that Cooper suffered a life-threatening injury because a medevac helicopter was used to carry him to a hospital in Shreveport.

12

(3) The same inference was bolstered by the testimony of Cooper's mother, who testified that she was advised to go to Shreveport because her son might not survive the injuries, and her testimony that her son spent four weeks in the hospital recovering.

(4) The severe damage to the automobile evidenced the severity of the impact, and the death of two healthy young men due to the severe impact, implies that Cooper's injuries were likely very serious.

We note that, analogous to the excessive blood loss in *Helou, supra,* the use of an ambulance does not necessarily mean a life-threatening or serious injury (Benavides was transported by ambulance to a hospital and he was merely "shaken up"); however, the use of a medevac helicopter to take Randarious to a hospital 100 miles away when there were ambulances available at the scene and hospitals nearby implies that his injuries were very serious or posed a substantial risk of death.

Therefore, we conclude that, based on the totality of the circumstantial evidence and testimony, a jury could reasonably find that Randarious suffered serious bodily injury beyond a reasonable doubt. While it would have been preferable for the jury to hear medical testimony of his injuries and medical treatment, or, at a minimum, testimony from Randarious himself or an eyewitness, when taken as a whole, the circumstantial evidence points to an injury that was life-threatening, in the sense of involving a "substantial risk of death" to Randarious. Viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found this essential element of the crime proven beyond a reasonable doubt.

13

For these reasons, we conclude that this assignment of error is without merit.

By his second assignment of error, Benavides alleges that the sentence imposed by the trial court is excessive and violates the 8th Amendment prohibition against cruel and unusual punishment.

Benavides, who is age 47, argues that the sentence is unconstitutionally harsh, given the fact that he has no prior offenses, has a wife and kids to support, and has been a productive member of the community for 25 years. Appellate counsel argues that Benavides has demonstrated remorse for this offense, and there appears to be a high probability of rehabilitation. He argues that this 39-year sentence appears to be grossly excessive and a needless infliction of pain and suffering.

The state contends that the court acted well within its discretion, as the sentencing range for vehicular homicide is 5 to 30 years and for first degree vehicular negligent injuring, up to 5 years.

Appellate review of sentences for excessiveness is a two-pronged inquiry. First, the record must show that the court complied with La. C. Cr. P. art. 894.1. The court need not list every aggravating or mitigating factor so long as the record reflects that it adequately considered the guidelines. *State v. Marshall*, 94-0461 (La. 9/5/95), 660 So. 2d 819. When the record shows an adequate factual basis for the sentence imposed, remand is unnecessary even in the absence of full compliance with the article. *State v. Lobato*, 603 So. 2d 739 (La. 1992). No sentencing factor is accorded greater weight by statute than any other factor. *State v. Taves*, 2003-0518 (La. 12/3/03), 861 So. 2d 144.

14

The second prong is constitutional excessiveness. A sentence violates La. Const. art. 1, § 20, if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless imposition of pain and suffering. *State v. Dorthey*, 623 So. 2d 1276 (La. 1993). A sentence is deemed grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice or makes no reasonable contribution to acceptable penal goals. *State v. Guzman*, 99-1753 (La. 5/16/00), 769 So. 2d 1158. The sentencing court has wide discretion in imposing a sentence within statutory limits, and such a sentence will not be set aside as excessive in the absence of manifest abuse of that discretion. *State v. Williams*, 03-3514 (La. 12/13/04), 893 So. 2d 7. The issue is not whether some other sentence might have been more appropriate, but whether the district court abused its discretion. *Id.*; *State v. Heins*, 51,763 (La. App. 2 Cir. 1/10/18), 245 So. 3d 1165.

Prior to imposing sentence, the court stated that it had decided not to order a PSI and he had looked at Benavides' criminal record and found that he had no criminal history. It had reviewed Art. 894.1 and found that Subsections (A)(2) and (3) are applicable, namely that the defendant is in need of correctional treatment that can be most effectively provided by commitment to an institution and any lesser sentence would deprecate the seriousness of the crime. The court stated that a suspended sentence was not available because two lives were taken. It also found the following aggravating factors listed in Art. 894 (B) applicable:

> B (1) The offender's conduct during the commission of
> the offense manifested deliberate cruelty to the victim.

15

(5) The offender knowingly created a risk of death or great bodily harm to more than one person.

(21) Other relevant aggravating factors: the court found that driving west in the eastbound lane of the interstate was an aggravating factor, and driving with a blood alcohol level of .15% was an aggravating factor.

There were no applicable mitigating factors, the court concluded.

At the outset we note that Benavides' sentence of imprisonment falls within the statutory limits of La. R.S. 14:32.1 (B) and is thus not statutorily excessive. It is clear that the district court considered the Art. 894.1 factors; however, we have some difficulty understanding how Benavides exhibited "deliberate cruelty" to the victims in this case. The additional aggravating factors under B(21) are essentially the factual elements of the offense. It is also unfortunate that the court did not order a PSI, so we have little background information regarding Benavides, other than he is 47 years old, married, and has minor children. He has no prior criminal record and stated that he was employed at the time of the accident. At the sentencing hearing, when he spoke to the family of the victims, he exhibited remorse for his actions and, after sentence was imposed, he requested the court to order rehabilitation.

The court initially imposed concurrent sentences of 20 years and 19 years at hard labor on Counts 1 and 2, vehicular homicide convictions, and it imposed a consecutive 3-year sentence for the first degree vehicular negligent injuring. The court stated that it was initially inclined to make the homicide sentences consecutive because of the loss of two young lives, but it ordered them concurrent since Benavides was a first-time offender. When the state objected, pointing out that the statute mandated a consecutive sentence for each homicide conviction, the court ordered the two sentences

16

to run consecutively, but amended the 3-year sentence for first degree vehicular negligent injuring to make it concurrent.

In 2015, the sentencing range for a conviction of vehicular homicide was imprisonment with or without hard labor for not less than five years nor more than 30 years, and a fine not less than $2,000 nor more than $15,000.

In *State v. LeBlanc*, 09-1355 (La. 7/6/2010), 41 So. 3d 1168, the Supreme Court reversed the appellate court and reinstated a 30-year maximum sentence at hard labor for vehicular homicide with the first three years to be served without benefit of probation, parole, or suspension of sentence even though the defendant was a first offender with no prior record and the mother of two adolescent boys. The mother had a combination of eight different drugs in her system, including prescription and illegal drugs. The court concluded that the defendant's guilty plea was not necessarily a reflection of her acknowledgment of the direct correlation between her drug usage and the death of the victim or her own moral culpability. The court concluded that the 30-year sentence gave the defendant incentives for rehabilitation within the prison system to take advantage of early release on parole.

In *State v. Crenshaw*, 39,586 (La. App. 2 Cir. 4/6/05), 899 So. 2d 751, *writ denied*, 05-1531 (La. 1/21/06), 922 So. 2d 544, the defendant was convicted by a jury of two counts of vehicular homicide and one count of first degree vehicular negligent injuring. The trial court sentenced him to the maximum of 20 years hard labor for each homicide and five years for first degree negligent injuring, with all three sentences to be served consecutively. At that time, imposition of consecutive sentences was discretionary where there were two or more victims of vehicular homicide.

The defendant argued on appeal that the imposition of consecutive sentences was constitutionally excessive. This court affirmed the consecutive sentences, noting that the defendant's record reflected that he was a substantial risk to the safety of the community; this offense was his fourth drunk driving incident, and his blood alcohol concentration level was .23%.

In this case, the midrange consecutive sentences imposed for two vehicular homicide convictions are harsh, considering that Benavides is 47 years old and has a young family. Although Benavides has no prior criminal record, he admitted that he had a drinking problem. He also admitted to police that he had drunk seven or eight beers, which so impaired his judgment that he entered I-20 traveling in the wrong direction against the traffic. He was apparently so intoxicated that he never realized he was driving the wrong way on the interstate despite nearly colliding head-on with several vehicles. The blood test exhibit shows that his blood was drawn at 0052 a.m. (12:52 a.m.) – more than 1½ hours after the accident. That test revealed a blood alcohol concentration level of .15%, which is nearly double the legal limit of .08.

Based on the facts of the case and the tragic loss of two young lives, we cannot conclude that the trial court abused its great discretion by imposing harsh sentences. Nor do we find that this sentence shocks our sense of justice. As in *LeBlanc*, *supra*, the long sentence should give the defendant the incentive for rehabilitation and to take advantage of early release on parole.

Accordingly, this assignment of error is without merit. The sentences are not constitutionally excessive.

## ERROR PATENT REVIEW

Our review of the record has disclosed several errors patent discoverable on the face of the record and which require remand.

### Illegal Sentence

The penalty for vehicular homicide includes:

> imprisonment with or without hard labor for not less than five nor more than thirty years, with at least three years of the sentence of imprisonment shall be imposed without benefit of probation, parole or suspension of sentence. If the operator's blood alcohol concentration is .15 per cent . . .then at least five years of the sentence . . . shall be without benefit of probation, parole, or suspension of sentence.

The sentencing transcript shows that the court failed to deny the benefits of probation, parole, or suspension of sentence for a minimum of three or five years as required by the statute.

Although the evidence showed that Benavides' blood alcohol level was .15%, the amended bill of information charged that he had a blood alcohol concentration of .08% or more.[6] Benavides was found guilty as charged.

We therefore remand to the district court for resentencing to impose the appropriate restriction of benefits in this case according to law.

### Fines, Default Time, and Reparations

The trial court imposed fines for each of the convictions. For Count I, the court ordered Benavides to pay "the mandatory restitution fine" of $5,000 or in default serve 720 days' imprisonment. It ordered the same fine and default prison time for Count II. For the conviction of first degree negligent injuring, the court ordered him to pay a $5,000 mandatory

---

[6] The original bill charged that Benavides' BOC was .15% or more.

19

restitution fine or, in default thereof, serve 180 days. The default time sentences were ordered to run concurrently.

When the sentence imposed includes a fine or costs, "the defendant shall be imprisoned for a specified period not to exceed one year." La. C. Cr. P. art. 884. In this instance, the court imposed $5,000 fines for each vehicular homicide and, in default of payment, to serve 720 days in prison. The default prison time is clearly in excess of one year.

We further note that it is well settled that an indigent defendant cannot be subjected to default jail time in lieu of the payment of a fine, costs or restitution. *State v. Jarratt*, 53,525 (La. App. 2 Cir. 6/24/20), 299 So. 3d 1202. A defendant's indigent status may be discerned from the record. *Id.* Benavides' trial counsel, John Roa, was appointed by the court at the request of the Indigent Defender office. On appeal, Benavides is represented by the Louisiana Appellate Project. We conclude that this is presumptive evidence of indigency.

Accordingly, we vacate those parts of the sentences that impose imprisonment in default of payment of a fine or costs or restitution.

The court also ordered Benavides to pay $5,000 to Crime Victims Reparations, to "cover the deceased victims' medical bills, pay for counseling of the survivors or pay for the counseling of Thomas Williams and Jamerro May's immediate family." The court noted, however, that the victims' families will have to file for any of that money separately.

Apparently, the statutory authority to levy these costs on the defendant is the Crime Victims Reparations Act, through which a person who is a victim of a crime or his legal representative may apply to the Crime Reparations Board for financial assistance. La. R.S. 46:1801 et seq. This

20

created a reparations fund composed of monies derived from appropriations by the legislature and several other sources, including "All monies paid as a cost levied on criminal actions, as provided by R.S. 46:1816(D) and (E)." Subsection D (1)(a) levies "a cost of not less than fifty dollars for felonies . . . on each criminal action . . . which results in a conviction." "These costs shall be *paid by the defendant*. No court may waive or suspend the imposition of the costs . . . *unless the defendant is found to be indigent.*" (Emphasis added.)

Because the record shows that Benavides is indigent, we vacate this provision from his sentence. We note, however, that this ruling does not affect the victims' ability to apply for or receive benefits from the Crime Reparations Board.

Finally, the instant Commitment Order incorrectly provides that Benavides must serve each sentence (20 years, 19 years, 3 years) without benefit of probation, parole, or suspension of sentence. This is contrary to the sentencing transcript and the court minutes, and it does not show the credit for time served prior to trial, which should be over 5½ years, that is, since the day after the accident on September 26, 2015.

Accordingly, on remand, we order the court to issue an amended Commitment Order that correctly reflects the time that must be served without benefits, as will be determined on remand, and correctly reflects the credit for time already served prior to sentencing. We further order the district court to send a copy of the amended Commitment Order to the clerk of this court within 45 days of the date this judgment is rendered.

21

**CONCLUSION**

For the foregoing reasons, we affirm Benavides' convictions for first degree negligent injuring and vehicular homicide. We affirm in part, vacate in part, and remand in part regarding the sentences imposed. For all sentences, due to Benavides' indigency, we vacate the default time in lieu of payment of the fines imposed. We affirm, in part, the sentences for vehicular homicide, but vacate the imposition of sentences without specifying a term to be served without benefit of probation, parole, or suspension of sentence. We remand for resentencing for that purpose. On remand, the court is to correct and amend the Commitment Order and send a copy thereof to the clerk of this court within 45 days of this judgment. Finally, due to Benavides' indigency, we vacate the $5,000 fine or costs that were ordered to be paid by him to the Crime Victims Reparation Fund.

In all other respects, the judgment of the district court is affirmed.

**AFFIRMED IN PART, VACATED IN PART, REMANDED FOR RESENTENCING.**

22